**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

In the Matter of:               }

ROGER DAN GUNTER    }     CASE NO. 19-80562-CRJ-7

                       }

                       }     CHAPTER 7

          Debtor.     }

FIRST BANK OF LINDEN    }     A.P. No. 19-80037-CRJ-7

                       }

          Plaintiff,    }

     v.               }

                       }

ROGER DAN GUNTER    }

                       }

          Defendant.   }

**MEMORANDUM OPINION ON COMPLAINT**
**TO DETERMINE DISCHARGEABILITY OF INDEBTEDNESS**

      This Adversary Proceeding came before the Court on December 14, 2020 for trial on the Complaint to Determine Dischargeability of Indebtedness filed by First Bank of Linden (hereinafter, the "Plaintiff" or "Bank") against Roger Dan Gunter (hereinafter, the "Defendant") seeking a determination that the debt owed by the Defendant is nondischargeable pursuant to 11 U.S.C. § 523(a)(6) as a debt for "willful and malicious injury."

      At the conclusion of the trial, the Court entered an Order Requiring Post-Trial Briefs, directing the parties to file Briefs specifically addressing relevant Eleventh Circuit case law and how the testimony and evidence presented during the trial relates to the Plaintiff's cause of action under the Bankruptcy Code.[1] On January 29, 2021, the parties filed their respective Post-Trial Briefs. The Court has now fully considered the Post-Trial Briefs, the testimony and evidence

---

[1]    Order Requiring Post-Trial Briefs, ECF No. 55; *See also*, Order Approving Motion for Extension of Time to File Post-Trial Briefs, ECF No. 59.

adduced during the trial, and the applicable law, and finds that the Plaintiff failed to prove by a preponderance of the evidence that the debt at issue should be excepted from discharge pursuant to § 523(a)(6) as a debt for willful and malicious injury by the Defendant to the Bank or to the property of the Bank.

The Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable by Rule 7052 of the Federal Rules of Bankruptcy Procedure.[2]

## FINDINGS OF FACT

### a. Background of the Lending Relationship

On February 11, 2008, the Defendant formed a limited liability company under the laws of the State of Alabama known as Foam Advantage Insulation, LLC (hereinafter "Foam Advantage").[3] The Defendant was the sole member of Foam Advantage, a home insulation business.[4] Between 2008 and 2018, the Bank extended seven loans to Foam Advantage and/or the Defendant individually for the purchase of equipment and operating capital. As security for these loans, the Defendant granted the Bank a lien on all equipment purchased with the loan proceeds.

The parties enjoyed a long-standing business relationship of mutual trust and confidence. Not only did the Defendant's wife work for the Bank, but Mike Robinson (hereinafter "Robinson"), the Executive Vice President of the Bank, testified that he had known the Defendant since 1995 and extended at least one loan to the Defendant for working capital without requiring additional

---

[2] To the extent any of the Court's findings of fact constitute conclusions of law, they are adopted as such. Further, to the extent any of the Court's conclusions of law constitute findings of fact, they are adopted as such.

[3] See Plaintiff's Exhibit 28.

[4] See Plaintiff's Exhibit 29.

Case 19-80037-CRJ    Doc 64    Filed 02/12/21    Entered 02/12/21 14:27:44    Desc Main
Document    Page 2 of 26

collateral based on the Defendant's income, credit score and general credit-worthiness. It is undisputed that the Defendant timely made payments on behalf of Foam Advantage to the Bank throughout the parties' ten-year banking relationship until the business failed and he could no longer afford the payments to the Bank as well as his other debts.

In May of 2018, the Defendant closed the business and moved to Scottsboro, Alabama where he had obtained employment at a papermill. Thereafter, in June of 2018, the Defendant obtained a consolidation loan from the Bank to lower his payments from $3,500 to $2,500 per month. There is no evidence of any inquiry by the Plaintiff about the Defendant's equipment, or any attempt to inspect the collateral. After his business had closed, the Defendant continued making the payments to the Bank through December of 2018, using the equity from the sale of his home. After the Defendant depleted the equity from the sale of his home, he was forced to seek relief under Chapter 7 of the Bankruptcy Code in February of 2019.

The Bank seeks to have the remaining debt owed by the Defendant in the approximate amount of $195,000 excepted from discharge, arguing that the Defendant willfully and maliciously injured the property interest of the Bank by failing to abide by the covenants, representations, and warranties of the Bank's many Notes, and Disclosure and Security Agreements (hereinafter, the "loan documents"). When the Defendant obtained the final consolidation loan, he no longer owned a 24-foot gooseneck trailer which had been sold in 2012, nor a starter rig trailer which he sold in 2014. The day after the Defendant obtained the consolidation loan, he also sold a forklift which was subject to the Bank's security interest. After the Defendant sold each item, he continued making payments to the Bank until January of 2019.

The Bank did not specifically ask the Defendant about the items of collateral, nor seek to examine the collateral described in the first seven loans, even when the Bank consolidated the loans. The Defendant testified that whenever he needed to purchase additional equipment or to obtain additional financing for his business, he routinely called Robinson's assistant, Darlene Jones (hereinafter "Jones"), who handled extensions and loan closings for the Defendant on behalf of the Bank. The Bank generally relied upon Jones to both prepare and explain the loan documents to the Defendant. The Defendant also trusted  the loan documents prepared by the Plaintiff without seeking the assistance of counsel and without closely reading the documents.   While the Defendant now admits that the Bank obtained a security interest in all equipment owned by Foam Advantage in May of 2012, he repeatedly testified that he did not know or understand that the Bank was taking a security interest in all equipment owned by Foam Advantage when he obtained the 2012 loan for the purpose of purchasing a second starter rig trailer and truck to expand the business.

### b.  Ten Year Loan History

Foam Advantage first obtained a loan from the Bank on February 15, 2008 in the original principal amount of $60,036.50 ("Note 9912").[5]  The Defendant signed Note 9912 in his capacity as the sole proprietor of Foam Advantage and in his individual capacity. The collateral listed as security for the loan was "One Starter Rig Trailer for Home Insulation and all Equipment on the Trailer."[6]   In the loan documents, the Defendant agreed to protect the collateral and the Bank's interest in the property against competing claims and further agreed not to sell, lease, transfer or

---

[5]     See Plaintiff's Exhibit 1, Note Disclosure, and Security Agreement.
[6]     See Plaintiff's Exhibit 1.

4

otherwise encumber the property without the Bank's prior written consent. [7] As further consideration for the loan, the Defendant executed an absolute and unconditional guaranty of all debts owed by Foam Advantage and the Defendant under the loan documents and all debt "at any time hereinafter owe[d] to Lender."[8]

To secure repayment of Note 9912, the Defendant also executed a Consumer Credit Agreement, granting the Bank a security interest in "One Starter Rig Trailer for Insulation of Homes and all Equipment on the Trailer."[9] On February 21, 2008, the Bank perfected its security interest by filing a UCC-1 Financing Statement with the Alabama Secretary of State.[10] Robinson testified that Foam Advantage timely made payments under Note 9912 pursuant to the terms of the Note.

On October 21, 2009, the Bank extended a $50,000 credit line to Foam Advantage ("Note 9914").[11] Note 9914 was also secured by the Starter Rig and all equipment on the trailer.[12] The Defendant executed Note 9914 and the attached Commercial Security Agreement in his capacity as sole proprietor of Foam Advantage and in his individual name. He also personally guaranteed all obligations under Note 9914.[13] During cross-examination, Robinson explained that he agreed on behalf of the Bank to extend the credit line without taking any additional collateral for the loan based, in-part, upon the Defendant's long-standing relationship with the Bank and good payment history.

---

[7]    *Id.*
[8]    *Id.*
[9]    *Id.*
[10]   See Plaintiff's Exhibit 2.
[11]   See Plaintiff's Exhibit 3.
[12]   See Plaintiff's Exhibit 3, Commercial Security Agreement.
[13]   See Plaintiff's Exhibit 3, Guaranty.

5

On May 4, 2012, Foam Advantage borrowed an additional $150,000 from the Bank for the stated purpose "To Purchase 2nd Rig for Foam Insulation and Truck" ("Note 9915"). The Defendant signed Note 9915 as sole proprietor of Foam Advantage and individually.[14] The collateral listed by the Bank as security for Note 9915 was "One Started [sic] Rig for Home Insulation and All Equipment on the Trailer: TCM Forklift . . . Horton Hauler Enclosed Trailer . . . Graco E-30 Plural Component Proportioner . . . Ingersol Rand Air Compressor . . . 24 FT Gooseneck Trailer . . . One High Side Utility Trailer . . . and One 2008 Ford F-250."[15] Note 9915 included a provision requiring the Defendant not to sell, lease, transfer or otherwise encumber the property without the Bank's prior written consent.[16]

In connection with Note 9915, on March 25, 2012, the Defendant provided the Bank with a list of Foam Advantage's assets, including the "Purchase Price" for the following items: (i) TCM Forklift - $4,500; (ii) Horton Hauler Enclosed Trailer - $10,000; (iii) Graco E-30 Plural Component Proportioner - $24,000; (iv) Ingersoll Rand Air Compressor - $1,999; (v) 24-foot Gooseneck Trailer - $4,000; (vi) High Side Utility Trailer - $4,000; and (vi) 2008 Ford F-250 - $54,000.[17] The list also included a description of the "new rig to purchase" (hereinafter the "second Starter Rig").[18] The Defendant listed the retail price for the second Starter Rig as $70,000, but testified that he actually built the second Starter Rig himself for approximately $36,000. The list also included a second truck "needed," which the Defendant priced at "approx. $30,000."[19]

---

[14]  See Plaintiff's Exhibit 4.
[15]  See Plaintiff's Exhibit 4, Commercial Security Agreement.
[16]  See Plaintiff's Exhibit 4.
[17]  See Plaintiff's Exhibit 5.
[18]  *Id.*
[19]  *Id.*

The Defendant testified that he was not told by the Bank that these items would be listed as security for the new loan, and that he did not know or understand that he was granting the Bank a security interest in the gooseneck trailer and the high side utility trailer when he executed Note 9915. The Defendant assumed that he was only giving the Bank a security interest in the two fully equipped Starter Rigs and the two Ford F-250 trucks. The Defendant explained that Robinson asked him to prepare a list of all equipment owned by Foam Advantage, including the additional equipment the Defendant sought to purchase. The Defendant testified that he provided the list of assets as requested to show the Bank that Foam Advantage had value. While the Defendant testified that no one explained to him that the Bank was taking a security interest in the additional trailers, Robinson testified that either he or his assistant, Jones, always spent at least fifteen to twenty minutes signing and explaining loan documents with borrowers, including the Defendant.

The parties further dispute whether the amount listed beside each asset under the heading "Purchase Price" constituted the Defendant's valuation of assets owned by Foam Advantage as of March 25, 2012, as asserted by the Bank, or merely was the amount the Defendant paid for each depreciable item of equipment, as asserted by the Defendant.

On May 21, 2012, the Bank filed a UCC-1 Financing Statement with the Alabama Secretary of State, covering "one started [sic] rig trailer for home insulation and equipment on the trailer."[20] The Bank recorded another UCC-1 Financing Statement on August 30, 2012, further describing all of the collateral covered by Note 9915.[21]

On October 1, 2012, the Defendant obtained an unsecured loan from the Bank in the amount of $30,000 to cover business expenses charged on the Defendant's credit card while

---

[20]    See Plaintiff's Exhibit 7.
[21]    See Plaintiff's Exhibit 8.

7

working out of town (hereinafter "Note 9916").[22] The Note was secured by "the terms of all present and future agreements with lender."[23]

On November 12, 2013, Foam Advantaged borrowed an additional $30,075 from the Bank secured by the "terms of all present and future agreements with lender, covers all debts . . . ." (Note 9917)[24] In connection with the loan, the Defendant executed another Guaranty, personally guaranteeing the payment of all debts under Foam Advantage and the Defendant individually.[25]

On March 7, 2014, the Bank agreed to renew Note 9914 in the amount of $90,075 ("Note 9918").[26]  To secure the repayment of Note 9918, Foam Advantage by and through the Defendant as sole proprietor and the Defendant individually executed a Commercial Security Agreement, granting the Bank a security interest in "2 Starter Rig Trailers for Foam Insulation and All Equipment on Both Trailers, One TCM Forklift . . One Horton Hauler Enclosed Trailer . . . Graco E-30 Plural Component Proportioner . . . One Ingersol Rand Air Compressor . . . 24 FT Goosneck [sic] Trailer  . . . One High Side Utility Trailer . . . and One 2008 Ford F-250 Pickup," (collectively, the "Property").[27] Under the heading Warranties and Representations, the loan agreements signed by the Defendant represented that the Defendant owned all of the Property listed and agreed not to sell the Property without the Bank's prior written consent. The Defendant executed Note 9918, as well as the attached Commercial Security Agreement, in his individual

---

22      See Plaintiff's Exhibit 9, Note, Disclosure, and Security Agreement.
23      *Id.*
24      See Plaintiff's Exhibit 12.
25      See Plaintiff's Exhibit 12, Guaranty.
26      See Plaintiff's Exhibit 13.
27      *Id.*

8

capacity.[28] The Defendant also personally guaranteed all debts of Foam Advantage and the Defendant individually.[29]

The Defendant argues that the description of the collateral listed in Note 9918 is inaccurate to the extent Note 9918 appears to describe three fully equipped Starter Rigs. The Defendant testified that the components of his first Starter Rig <u>included</u> the Horton Hauler Enclosed Trailer, the Graco E-30 Proportioner, and the Ingersoll Rand Air Compressor. During his testimony, Robinson acknowledged that, regardless of the descriptions contained in any of the loan documents, the Bank's collateral should not have listed three fully equipped Starter Rigs, although these loan documents did.

On October 23, 2014, Foam Advantage entered into another renewal with the Bank in the amount of $140,075 ("Note 9919").[30] In connection with the renewal, the Defendant executed a Commercial Security Agreement, granting the Bank a security interest in "2 Starter Rig Trailers for Foam Insulation and all Equipment on Both Trailers, One TCM Forklift . . . , One Horton Hauler Enclosed Trailer, Graco E-30 Plural Component Proportioner, One Ingersol Rand Air Compressor, 24 Foot Gooseneck Trailer, One High Side Utility Trailer, and One 2008 Ford F250-Pickup."[31] On page 2 of the Commercial Security Agreement, the Defendant once again affirmed that he owned all of the Property described therein and agreed not to sell the Property "without Security Party's prior written consent."[32] In connection with Note 9919, the Defendant executed an unlimited Guaranty of all debt in the name of Foam Advantage.[33]

---

[28] See Plaintiff's Exhibit 13.
[29] See Plaintiff's Exhibit 13, Guaranty.
[30] See Plaintiff's Exhibit 14.
[31] See Plaintiff's Exhibit 14, Commercial Security Agreement.
[32] *Id.*
[33] See Plaintiff's Exhibit 14, Guaranty.

9

On April 21, 2015, Foam Advantage executed another loan agreement with the Bank in the amount of $30,075, signed by the Defendant as the sole proprietor of Foam Advantage and individually (hereinafter Note 9920").[34]

Prior to 2018, the Defendant had two separate loans with the Bank, one for purchasing equipment and one for a line of credit. On June 8, 2018, Foam Advantage executed loan documents (hereinafter "Note 2515") in favor of the Bank with an original principal amount of $191,241.57, consolidating the loans.[35] The Defendant obtained the loan consolidation to reduce his monthly payments from $3,500 to $2,500 so that he could continue making payments to the Bank.

The repayment terms on Note 2515 were eleven monthly payments of $2,500 to be paid beginning July 25, 2018 with a final balloon payment of the outstanding balance due on June 25, 2019, with 8.557% interest.[36] The collateral listed as security for the loan was "2 Starter Rig Trailers for Foam Insulation and All Equipment on Both Trailers, One TCM Forklift . . . One Horton Hauler Enclosed Trailer . . . Graco E-30 Plural Component Proportioner . . . One Ingersol Rand Air Compressor . . . 24 FT Gooseneck Trailer . . . One High Side Utility Trailer."[37] The Commercial Security Agreement, executed by the Defendant as sole proprietor and individually, provided that no modifications of the agreement would be "effective unless made in writing and signed by the Debtor and Lender."[38]

---

[34] See Plaintiff's Exhibit 15.
[35] See Plaintiff's Exhibit 18.
[36] See Plaintiff's Exhibit 18.
[37] See Plaintiff's Exhibit 18, Commercial Security Agreement.
[38] *Id.*

10

Note 2515 was the final loan agreement executed between Foam Advantage and the Bank. On page 2 of the Commercial Security Agreement, the Defendant once again agreed that he would not sell the Property securing Note 2515 "without Lender's prior written permission . . ."[39]  As with prior agreements, in these loan agreements the Defendant warranted that he owned all the Property described in Note 2515. The loan agreements further provided for the payment of reasonable attorneys' fees the Bank incurred to collect the debt as awarded by any Bankruptcy Court.[40] On June 8, 2018, the Bank filed a UCC-1 Financing Statement listing the collateral described in Note 2515.[41]

At trial, the Defendant admitted that he did not own all of the Property listed as security for Note 2515 when he executed the loan documents. While the Defendant testified that he only thought the first Starter Rig served as collateral for Note 2515 because he had already sold the second Starter Rig as will be further discussed below, the Defendant now admits that the Commercial Security Agreement which he testified that he had not read included two Starter Rig Trailers, the TCM Forklift, Horton Hauler, and Air Compressor.   There is no evidence that the Bank ever discussed the specific equipment listed as collateral with the Defendant.

c.  **Sale of Collateral**

Robinson testified that between 2008 and 2018, the Bank only released in writing two items of collateral from the various loans made to the Defendant, the two Ford F-250 trucks. In August of 2013, Foam Advantage and the Bank entered into an Extension, Renewal and Modification of Note 9915, pursuant to which the Bank released one 2008 Ford F250 from the Note.   The

---

[39]    See Plaintiff's Exhibit 18, Commercial Security Agreement.
[40]    See Plaintiff's Exhibit 18.
[41]    See Plaintiff's Exhibit 19.

Defendant testified that he decided to trade in the truck because it was unreliable even after he paid $12,000 to rebuild its engine.[42]  The Defendant obtained the release to trade-in the Ford F-250 for a 2014 GMC truck. On September 28, 2016, the Bank also released the second 2008 Ford F-250 truck from the loan which Defendant decided to sell because he was no longer using the vehicle.[43] Robinson testified that the Bank agreed to release one of the Ford F250 trucks for $4,500 and the other for $2,000.  The Defendant testified that the Bank allowed his wife to sign his name on both releases, which the Bank denied.

Each time the Bank executed the releases in exchange, it received payments so the Defendant could transfer the titles.  It is undisputed that the Bank did not release any other collateral in writing.  Robinson testified that the Bank continued to work with the Defendant after releasing each of the trucks as collateral, because the Defendant continued making payments to the Bank.

According to Robinson, the Bank was unaware that the Defendant no longer owned two additional items of collateral when the Bank agreed to consolidate Foam Advantage's loans. Robinson testified that the Bank would not have made the consolidation loan had it known that the Defendant no longer owned the gooseneck trailer and the second Starter Rig. However, Robinson did not testify that he asked the Defendant about the status of collateral, nor that the Defendant misrepresented when certain equipment had previously been sold.

The Defendant testified that sometime between 2012 and 2014, he sold the gooseneck trailer to Danny McElroy and Charlie Ethridge for $1,000. The Defendant did not obtain a written release from the Bank for the trailer, explaining that he did not understand that he was required to

---

[42]     See Defendant's Exhibit I.
[43]     See Defendant's Exhibit K.

12

do so because he did not know the trailer was included as collateral securing the Bank's debt. Thereafter, the Defendant continued to make timely payments to the Bank until January of 2019.

On June 9, 2014, Foam Advantage and the Defendant also sold the second Starter Rig to Christopher Ryan for $20,000.[44] Christopher Ryan testified that he was not aware that the Bank had a lien on the Starter Rig when he purchased the equipment from the Defendant. At trial, Robinson admitted that the Bank did not have a title for the Starter Rig which needed to be released to transfer title to the equipment.

The Defendant explained that he decided to sell the second Starter Rig because he was not using it enough to justify the monthly expense required to maintain the hoses on the Starter Rig, which he estimated would cost approximately $5,000 to replace if they became corroded due to nonuse. On June 10, 2014, Foam Advantage made a $20,000 payment on Note 9918 with the proceeds from the sale of the second Starter Rig.[45] Thereafter, the Defendant continued making all payments to the Bank until January of 2019.

On June 9, 2018, Foam Advantage and the Defendant also sold the TCM Forklift in which the Bank had a perfected security interest to Derek Westbrook and Westbrook Welding for $1,500, just one day after the Defendant obtained the consolidation loan.[46] On June 11, 2018, the Defendant deposited $1,500 into Foam Advantage's account at the Bank from the sale of the forklift.[47] The Defendant now admits that the forklift was included as collateral for Note 2515, but testified that he did not understand that it was included when he obtained the consolidation

---

[44] See Plaintiff's Exhibits 20 and 21.
[45] See Defendant's Exhibit P.
[46] See Plaintiff's Exhibit 23.
[47] See Defendant's Exhibit Q.

13

loan. He further testified that he sold the forklift because chemical suppliers now have trucks with hydraulic lifts which can load supplies onto Starter Rigs, making the forklift unnecessary.

At trial, the Defendant admitted that he sold the gooseneck trailer and forklift without seeking written permission from the Bank because he did not know that such equipment was included as collateral for any of the loans. Jones denied giving the Defendant verbal permission to sell any of the equipment and, instead, testified that the Defendant never called the Bank to request a release for the gooseneck trailer, the second Starter Rig, nor the forklift. According to Jones, the Defendant only requested that the Bank release the titles for the two Ford F-250 trucks.

Robinson also testified that the Defendant never requested that the Bank release its lien on any of the property included as collateral other than the two trucks and that he would not have agreed to release the Bank's lien on the second Starter Rig for $20,000 because the Bank valued the Starter Rig at $40,000. Nor would the Bank have released its lien on the gooseneck trailer for $1,000 because the Bank valued the trailer at $4,000 based on the list provided by the Defendant in connection with Note 9915.[48]

### d. Termination of Business

In May of 2018, the Defendant moved to Scottsboro, Alabama and began working full-time for a papermill prior to obtaining the loan consolidation. When the Defendant sold his home, he used the home equity of $51,903.76 in which the Plaintiff had no lien or other interest, to continue making payments in the amount of $2,500 per month on Note 2515 through December of 2018. The Defendant testified that he hoped to re-establish his home insulation business in

---

[48]     See Plaintiff's Exhibit 5.

Scottsboro with the remaining Starter Rig while working at the papermill but was unable to do so, in part, because his hours and responsibilities at the papermill were greater than he had anticipated.

On February 25, 2019, the Defendant sought relief under Chapter 7 of Title 11 of the United States Bankruptcy Code.   On May 30, 2019, the Bank commenced this Adversary Proceeding by filing a Complaint to Determine Dischargeability of Indebtedness, seeking a determination that the debt owed by the Defendant in the amount of $194,999.76 as of March 4, 2019 should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(6), arguing that the Defendant liquidated all, or a portion of the collateral described in Note 2515.

Robinson testified that the Bank has now repossessed the first Starter Rig for which the Defendant is entitled to a $6,000 credit. The High Side Utility Trailer remains in the Defendant's possession which the Bank values at $1,000.   The principal balance owed on Note 2515 is approximately $195,000, plus any collection expenses and attorney's fees owed as provided for by the terms of Note 2515 and as permitted by the Bankruptcy Code.

A review of the evidence in this Adversary Proceeding clearly shows that the parties in this case had a long-standing business relationship which caused both parties to assume facts that led to the controversy before the Court.   The mutual trust that the business relationship engendered led the Defendant to repeatedly sign, without review or the advice of legal counsel, many loan documents over a ten-year period without closely reviewing the list of collateral pledged therein. Likewise, the Plaintiff repeatedly requested that the loan documents be signed by the Defendant and even his wife without inquiring specifically about the collateral listed as security for such loans, or taking any action to inspect the collateral.   The Defendant apparently assumed and believed that the collateral listed in the loan documents included only the equipment listed in the

initial loan documents, and the Plaintiff apparently assumed that the collateral listed in the loan documents was accurate without ever inquiring about the status of the collateral or seeking to inspect the collateral. Failure to review loan documents before signing is careless and inexcusable, but does not necessarily mean that an unknowing sale of equipment included as collateral in the loan documents causes a willful and malicious injury.

## CONCLUSIONS OF LAW

A fundamental objective of the Bankruptcy Code "is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy a new opportunity in life with a clear field for future effort."[49] To effectuate the fresh start policy, the "Bankruptcy Code contains broad provisions for the discharge of debts, subject to" the limited exceptions enumerated in Section 523(a) of the Code.[50] As observed by the Eleventh Circuit, "'courts generally construe the statutory exceptions to discharge in bankruptcy 'liberally in favor of the debtor,' and recognize that '[t]he reasons for denying discharge . . . must be real and substantial, not merely technical and conjectural.'"[51]

### a. Standard under 11 U.S.C. § 523(a)(6)

Section 523(a)(6) of the Bankruptcy Code excepts from discharge "any debt . . . for willful and malicious injury by the debtor to another entity or to the property of another entity."[52]  As

---

[49]     *Beem v. Ferguson (In re Ferguson),* 713 Fed. Appx. 974, 977 (11th Cir. 2018)(quoting *In re St. Laurent,* 991 F.2d 672, 680 (11th Cir. 1993)).

[50]     *Lamar, Archer & Cofrin v. Appling (In re Appling),* 138 S. Ct. 1752, 1758 (2018).

[51]     *Haas v. Fancher (In re Fancher)*, 802 Fed. Appx. 538, 544 (11th Cir. 2020)(quoting *In re Miller*, 39 F.3d 301, 304 (11th Cir. 1994)).

[52]     11 U.S.C. § 523(a)(6).

recently explained by the Eleventh Circuit "'debt for' is used throughout [§ 523(a)] to mean, 'debt as a result of,' 'debt with respect to,' 'debt by reason of,' and the like."[53]   The applicable standard of proof in all § 523(a) dischargeability proceedings is the "ordinary preponderance-of-the-evidence standard."[54]

The terms "willful" and "malicious" are distinct concepts for purposes of § 523(a)(6).   The term willful "means 'a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury.'"[55]  "'Malicious' means 'wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill will.'"[56]   Thus, to prevail on its claim that the debt at issue is nondischargeable, the Bank must establish by a preponderance of the evidence that the injury at issue was both willful and malicious for purposes of § 523(a)(6).[57]

### b.  Willful

In the Eleventh Circuit, "[a] debtor is responsible for a 'willful' injury when he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury."[58]  "Section 523(a)(6) does not except from discharge intentional acts which cause injury; it requires instead an intentional or deliberate injury."[59]  As explained by the Supreme Court, "[t]he word 'willful' in [§ 523](a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury."[60]

---

[53]      *SE Property Holdings, LLC v. Gaddy* (*In re Gaddy*)*, 977 F.3d 1051, 1058 (11th Cir 2020)(quoting *Cohen v. de law Cruz,* 523 U.S. 213, 220 (1998)).
[54]      *Grogan v. Garner*, 498 U.S. 279, 291 (1991).
[55]      *In re Ferguson*, 713 Fed. Appx. at 983 (quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998)).
[56]      *Id.* (*quoting In re Jennings,* 670 F.3d 1329, 1334 (11th Cir. 2012)).
[57]      *See In re Fancher,* 802 Fed. Appx. at 544. (11th Cir. 2020); *Kane v. Stewart Tilghman Fox & Bianchi (In re Kane),* 755 F.3d 1285, 1293 (11th Cir. 2014)(citing Grogan v. Garner, 498 U.S. 279, 291 (1991)).
[58]      *In re Gaddy,* 977 F.3d at 1058 (quoting *In re Kane*, 755 F.3d at 1285)).
[59]      *Hope v. Walker (In re Walker),* 48 F.3d 1161, 1164 (11th Cir. 1995)(quoting *Famers Insurance Group v. Compos (In re Compos)*, 768 F.2d 768 F.2d 155, 1158 (10th Cir. 1985)).
[60]      *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998).

"In other words, a willful injury means 'a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury."[61] "[I]njuries caused by negligent or even reckless conduct do not qualify as willful injuries under § 523(a)(6)."[62]

The Eleventh Circuit has acknowledged that the deliberate sale of collateral and conversion of the proceeds without payment to the secured creditor may prevent the discharge of the indebtedness under § 523(a)(6) where the debtor commits a "knowing breach of a clear contractual obligation that is certain to cause injury."[63]   However, as observed by the Supreme Court,

> [A] willful and malicious injury does not follow of course from every act of conversion without reference to the circumstances.  There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice. . . . There may be an honest but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a willful and malicious one."[64]

In the case of *Wolfson v. Equine Capital Corp. (In re Wolfson)*, 56 F.3d 52 (11th Cir. 1995), the Eleventh Circuit Court of Appeals explained that a creditor's failure to take reasonable steps to protect its collateral may prevent application of § 523(a)(6).   In *Wolfson*, the Chapter 7 debtor, a horse farmer, routinely deposited proceeds from the sale of horses pledged as collateral to the bank into his general business account out of which the debtor paid ordinary business expenses. Despite being aware of the debtor's accounting practices, the bank continued to renew and extend credit to the debtor. The Eleventh Circuit found that the debtor's belief that his business practices were known to the bank, engendered by the parties' course of dealing, was reasonable and under the Supreme Court's decision in *Davis v. Aetna Acceptance Co.*, 293 U.S. 328 (1934), supported

---

[61]     *Nix v. PNC Bank, N.A. (In re Nix)*, 2019 WL 450853, *2 (N.D. Ala. 2019)(quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998)(emphasis in original)).

[62]     *Id. a*t *3.

[63]     *Monson v. Galaz (In re Monson)*, 661 Fed. Appx. 675, 683 (11th Cir. 2016).

[64]     *Davis v. Aetna Acceptance Co.,* 293 U.S. 328 (1934*).*

18

the conclusion that the debtor committed the act of conversion, but not willful or malicious conversion for purposes of § 523(a)(6).

In the instant case, the Court finds that the Bank established by a preponderance of the evidence that the Defendant represented multiple times that he owned all collateral described in each of the loan documents, that the Defendant intentionally liquidated collateral securing the Bank's loans, that he did so without obtaining prior written consent in default of the loan documents, and that the Defendant sold equipment without the Bank's knowledge. As observed, however, by the Supreme Court and the Eleventh Circuit, not every loan default or even conversion which results from the nonconsensual sale of collateral is willful and malicious for purposes of § 523(a)(6). Instead, the "dischargeability of contractual debts under Section 523(a)(6) depends upon the knowledge and intent of the debtor at the time of the breach."[65]

Here, the Court finds that the Bank failed to establish by a preponderance of the evidence that the Defendant sought or desired the injury giving rise to the debt or that he committed a knowing breach of a contractual obligation that was certain to cause injury. The course of dealing between the parties over many years resulted in the careless actions and inactions of the parties in this case. The evidence before the Court does not show that the Defendant was asked and therefore did not make any misrepresentations about the items of collateral, other than to sign loan documents and the loan consolidation, and there is no persuasive evidence that he understood that changes had been made to the list of collateral over the years. The sale of collateral took place over a period of approximately eight years, beginning with the sale of the gooseneck trailer in 2012 for $1,000, the second Starter Rig in 2014 for $20,000, and finally the forklift in 2018 for $1,500.

---

[65] *Id.*

19

While the evidence is unclear whether the Defendant used the proceeds from the sale of the gooseneck trailer in 2012 to pay the Bank, the evidence clearly established that the Defendant remitted the proceeds from the sale of the second Starter Rig in 2014 to the Bank the day after he sold the equipment and that he immediately deposited the proceeds from the sale of the forklift in 2018 into his account at the Bank. After the sale of each piece of equipment, the Defendant continued to timely pay the Bank monthly payments until January of 2019.

The Plaintiff argues that the facts of this case are analogous to the facts in the Eleventh Circuit's *In re Monson* decision in which the Court of Appeals held that a debt arising out of the debtor's unauthorized removal of computer equipment from his internet gaming café was nondischargeable as a debt for "willful and malicious injury."[66]  In *Monson*, the debtor met the claimant's son while they were in federal prison.   After their release, the debtor and the claimant's son discussed partnering in a joint venture to open an internet café which the claimant's wholly owned limited liability company financed by loaning the debtor $130,000 secured by the computer equipment.

After law enforcement raided the gaming café and seized equipment based on allegations that the internet café was engaged in illegal online gambling, the claimant issued a notice to the debtor demanding liquidation of the equipment to repay the loan. Instead, law enforcement allowed the debtor to retrieve the equipment contingent upon the debtor agreeing to not reopen the café in the same county. Upon retrieving the equipment, the debtor formed a new entity for the purpose of carrying on the internet café in a new county and failed to pay the claimant pursuant to the terms of their agreement.[67]   After the claimant obtained a judgment against the debtor in state court, the

---

[66]     *In re Monson*, 661 Fed. Appx. 675 (11th Cir. 2016).
[67]     *Id.*

20

debtor filed for relief under Chapter 7 of the Bankruptcy Code, and the claimant filed a complaint seeking to have the judgment excepted from discharge. At trial, the debtor argued that once he received a notice of default and a letter from the claimant purporting to terminate their agreement, he believed that their entire agreement was "finished, and done with."[68]

The Eleventh Circuit affirmed the bankruptcy court's finding that the debtor committed a willful and malicious injury within the meaning of § 523(a)(6). The act of absconding with the creditor's collateral and using it to open a new business was an "intentional act the purpose of which [was] to cause injury or which [was] substantially certain to cause injury."[69] The Eleventh Circuit further determined that the act of absconding with the equipment was malicious for purposes of § 523(a)(6) because the intentional act was inherently "wrongful, without just cause, and excessive."[70] The Court of Appeals explained that "the dischargeability of contractual debts under Section 523(a)(6) depends upon the <u>knowledge</u> and <u>intent</u> of the debtor at the time of the breach . . . ."[71] [emphasis added]

The facts in *Monson* are clearly distinguishable from the facts in this case. While the Court finds that the Defendant's sale of collateral between 2012 and 2018 constituted a clear default under the loan agreements and was a deliberate or intentional *act* that may have led to injury, the Court does not find that the Defendant acted with deliberate intent to cause *injury* to the Bank for purposes of § 523(a)(6). The Court is mindful that the Bank bears the burden of establishing by a preponderance of the evidence that the debt at issue should be excepted from discharge pursuant to § 523(a)(6) and that courts must narrowly construe exceptions to discharge

---

[68] *Id.* at 678.
[69] *Id.* at n. 9.
[70] *Id.* at 684.
[71] *Id.* at 683 (quoting *In re Williams*, 337 F.3d 504, 510 (5th Cir. 2003)).

"to give the debtor a fresh start, free from debt."[72] Here, unlike the debtor in *Monson* who absconded with collateral, opened a new business, and failed to pay the claimant pursuant to the terms of their agreement, the evidence in this case establishes that the Defendant used the proceeds from the sale of collateral between 2012 and 2018 to continue paying the Bank while operating his business. There is no evidence that the Defendant absconded with the proceeds or used the proceeds to pay other debts. The Eleventh Circuit has explained that by adopting a requirement that the conversion of property be both willful and malicious, "Congress expressly overruled prior caselaw that had refused dischargeability when the conversion occurred innocently or recklessly."[73] There must be something more than the mere sale of collateral in default of loan agreements as is the case here.

Further, "[w]hen financial harms are alleged, it must be shown that the debtor 'actually knew, at the time of the intentional act, that injury was substantially certain to result.'"[74] Here, the Court finds that the Bank has not proven by a preponderance of the evidence that the Defendant knew that injury was substantially certain to result when he sold any of the collateral. On June 9, 2014, the Defendant sold the second Starter Rig to Christopher Ryan for $20,000. However, the following day, Foam Advantage paid $20,000 to the Bank using the proceeds from the sale of the second Starter Rig. During the trial, Robinson and Jones both denied that they knew or gave the Defendant verbal permission to sell the second Starter Rig. While the Court did not find their testimony to be entirely credible, the Court finds that even if the Defendant sold the second Starter Rig without permission, he did not sell the Starter Rig with intent to injure the Bank. The

---

[72] *Property Holdings, LLC v. Gaddy (In re Gaddy)*, 997 F.3d 1051, 1053 (11th Cir. 2020); *See also In re Miller*, 39 F.3d 301, 304 (11th Cir. 1994).
[73] *In re Held*, 734 F.2d 628 (11th Cir. 1984).
[74] *United States of America v. Reid (In re Reid)*, 598 B.R. 674 (Bankr. S.D. Ala. 2019)(Oldshue, J.).

Defendant testified that he was no longer using the equipment and that he was concerned that the hoses on the Starter Rig would corrode due to nonuse. After he sold the Starter Rig, the Defendant paid the sale proceeds directly to the Bank and continued making payments to the Bank for an additional four years. Further, there is no evidence that the Bank ever sought to inspect the collateral or that the Defendant affirmatively misrepresented to the Bank the status of the collateral securing the loans while the Bank continued to renew and extend additional credit to the Defendant. Accordingly, under the circumstances of this case, the Court finds that the Bank failed to establish that the Defendant acted with specific intent to cause economic injury to the Bank, or that he thought or knew injury was substantially certain to result from the sale of the items of collateral.

### c. Malice

The Court also finds that the facts in this case are not sufficient to imply malice for purposes of § 523(a)(6).  To establish malice, the Bank must show that the Defendant's actions were "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill will.'"[75]  "A showing of specific intent to harm another is not necessary."[76] Instead, "[m]alice can be implied."[77]  Indeed, "'[c]onstructive or implied malice can be found if the nature of the act itself implies a sufficient degree of malice.'"[78]

The Plaintiff relies on the opinion of this Court in *PNC Bank, N.A. v. Nix (In re Nix),* 2018 WL 3339620 (Bankr. N.D. Ala. 2018), *aff'd* 2019 WL 450853 (2019)(Kallon, J.), in which this

---

[75]     *In re Ferguson*, 713 Fed. Appx. at 983 (*quoting In re Jennings,* 670 F.3d 1329, 1334 (11th Cir. 2012)).
[76]     *In re Kane*, 755 F.3d at 1294.
[77]     *Id.*
[78]     *In re Monson*, 661 Fed. Appx. at 683(*quoting Ikner*, 883 F.2d 986, 991 (11th Cir. 1989)).

Court found that the debtor's actions were malicious for purpose of § 523(a)(6). In that case, the debtor sold membership units in a hospital, which he had pledged to the plaintiff as collateral for a loan, for a total of $185,744 and actively concealed the sale of the membership units when a bank representative called to inquire about the location of the stock certificates, telling the representative that he was unsure even though he had already sold three of the five units. In *Nix*, the debtor also used the sales proceeds to pay other debts and misrepresented to the purchaser of the units, the hospital, that the units were not pledged as collateral to the plaintiff.

While the Bank argues that the facts in *Nix* are similar to this case because the Defendant did not tell the purchaser of the second Starter Rig Trailer that the trailer was subject to the Bank's lien, the Court finds that the facts in this case are easily distinguishable. Here, the Defendant sold the second Starter Rig for $20,000 and remitted the entire balance of the sales proceeds to the Bank the following day. Further, the Defendant did not misrepresent to the purchaser whether there was a security interest in the Starter Rig. Thereafter, the Defendant continued to timely make payments to the Bank for an additional four years until forced to seek relief under Chapter 7 of the Bankruptcy Code. During this period there is no evidence that the Bank ever sought to inspect the collateral. Unlike the facts in the *Nix* case, the Defendant here did not actively deceive the Plaintiff as to the existence or whereabouts of the collateral, other than by signing loan documents which the Defendant testified that he did not read closely. Further, the Defendant in this case did not retain the proceeds from the sale of the collateral and there were no repeated and intentional misrepresentations to the Plaintiff as the Court found in *Nix*. In addition, unlike the *Nix* case, the value of the collateral sold would not clearly have paid the Plaintiff's claims in full.

24

Finally, unlike the defendants in *Monson* and in *Nix*, there is no evidence or even argument that the Defendant in this case sought to personally benefit, or in fact personally benefitted, from the unauthorized sale of the collateral. Accordingly, the Court finds that the Bank failed to establish that the Defendant's actions were wrongful and without just cause or excessive under the circumstances of this case.

## CONCLUSION

The Court finds that the Bank established by testimony and other evidence that the Defendant repeatedly signed loan documents which listed certain collateral that did not then exist or that he had sold without written consent of the Plaintiff in violation of the specific terms of the loan documents. Nonetheless, the Bank failed to establish that the debt at issue is a debt for "willful and malicious injury" caused by the Defendant to the Bank or to the property of the Bank. Every breach of contract or even unauthorized sale of collateral does not automatically result in a willful and malicious injury causing the nondischargeability of a debt. The evidence established that the Defendant had an honest but mistaken belief about the Bank's collateral which resulted from the years-long course of dealings between the parties. The Defendant did not sell the Bank's collateral and use the sale proceeds to pay other debts, to enter a new business venture, or even to pay his own living expenses. Instead, the evidence establishes that the Defendant used the sale proceeds to continue paying his debt to the Bank while attempting to operate his business. After several years of struggling to maintain the business and pay the debt owed to the Bank, the Defendant sold his home and moved to obtain a fulltime job, consolidated the debt owed to the Bank to lower his payments, and attempted to re-establish his business while working fulltime.

25

Even after the Debtor sold his home and moved to obtain a new job, he continued to timely make payments on 2515 Note. The Defendant appears to have done everything he could to pay the loans owed to the Bank, not to injure the Bank or its property.

Unlike the debtors in *Monson* and *Nix*, the Court finds that there are no aggravating factors in this case involving active deception of the Bank, nor showing actual or constructive malice by the Defendant as required to find the debt nondischargeable. The misinformed sale of collateral by the Defendant in violation of loan documents alone is not enough to meet the statutory requirement for discharge of the debt in this case. Section 523(a)(6) does not create strict liability for the unauthorized prepetition sale of collateral by the Defendant. Notwithstanding the unauthorized prepetition sales of collateral, the Defendant in this case is still the type of debtor for whom the fresh start under the Bankruptcy Code was intended.

For the reasons stated, the Court finds that the Bank failed to carry its burden to prove by a preponderance of the evidence that the debt at issue is nondischargeable under 11 U.S.C. § 523(a)(6) as a debt for willful and malicious injury. Thus, the debt owed by the Defendant to the Bank is dischargeable under the Bankruptcy Code.

A separate judgment will be entered consistent with the ruling of this Memorandum Opinion.

Dated this the 12th day of February 2021.

/s/ Clifton R. Jessup, Jr.
Clifton R. Jessup, Jr.
United States Bankruptcy Judge

26